## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SHAWN ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 04-2413-KHV |
| JOHN E. POTTER, Postmaster General Of The | ) | |
| United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Shawn Alexander filed suit against his former employer, John E. Potter, Postmaster General of the United States Postal Service ("USPS"). Plaintiff alleges that the USPS discriminated against him because of race and retaliated against him for protected activity, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. This matter is before the Court on Defendant's Motion To Dismiss, Or In The Alternative For Summary Judgment (Doc. #98) filed March 3, 2006. For reasons stated below, the Court grants summary judgment in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of

evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

2

In 1996, plaintiff, an African American, started work as a mail handler for the USPS at the Processing & Distribution Center (P&DC) in Kansas City, Kansas. Approximately 350 persons, including full-time regular (FTR) and part-time flexible (PTF) employees, worked at the P&DC on a typical day in 2000 and 2001. Plaintiff was a PTF employee.[1]

The P&DC plant manager oversees the entire facility. The Manager of Distribution Operations (MDO) oversees a specific shift. Supervisors of Distribution Operations (SDO) directly supervise employees assigned to their specific operations. SDOs typically manage groups of 25 to 35 employees. Some groups, however, including plaintiff's groups, were as small as five employees.

USPS has a progressive discipline policy. Depending on the nature and severity of the infraction, the types of discipline include a verbal discussion, a formal verbal (official) discussion, a letter of warning, a seven-day suspension, a 14-day suspension and removal.

Several USPS managers observed plaintiff away from his assigned work station or not performing the work to which he was assigned. Two of plaintiff's supervisors testified that he was an average employee. Plaintiff evaluated his own performance as average.

---

[1]     PTF employees worked anywhere they were needed, for any supervisor, as long as they had the required training. Managers did not have to assign PTF employees by seniority. In practice, however, they did so. PTF employees could choose to be members of the Postal Worker's Union. Except for casual employees, PTF employees were the lowest in seniority. Lunch breaks for all PTF employees were limited to 30 minutes.

USPS guaranteed FTR employees, whether clerks or mail handlers, eight hours a shift, 40 hours per week and a fixed work schedule. In contrast, the USPS guaranteed PTF employees only four hours per shift. In addition, PTF employees worked a flexible schedule including reporting time and days off. Neither FTR employees nor PTF employees were entitled to one hour notice before overtime work under the collective bargaining agreement ("CBA"). As a courtesy, however, management tried to give all employees one hour notice (or more) if overtime work was needed.

On January 1, 1999, Joe Lynch, a supervisor, admonished plaintiff by official discussion for long wash-ups and breaks. Plaintiff denied that he engaged in such conduct. On June 22, 2000, Michael Tamayo admonished plaintiff by official discussion because of irregular attendance. Plaintiff acknowledged the admonishment. Plaintiff does not allege that Lynch or Tamayo discriminated or retaliated against him.

Pat Clark, the P&DC acting plant manager between February 2001 and December 2003, regarded Kendrea Shingleton and Colleen Taylor as excellent supervisors. Taylor was a very strict manager and employees of all races, management and non-management alike, complained about her management style which was substantially different from the styles of other managers. Taylor instituted disciplinary actions against employees of all races.

On June 17, 2000, Taylor determined that on numerous occasions plaintiff had been told the timing and manner for taking breaks and lunch breaks, but that on that day, he did not properly time out and took longer than 30 minutes for lunch.[2]

On June 18, 2000, Yvette Jenkins, an African-American supervisor, reported that she had seen plaintiff at a convenience store as she was driving to work. USPS concluded that plaintiff was absent without authorization from 7:00 p.m. until 7:35 p.m., purportedly for his lunch break, but he did not clock out until approximately 7:40 p.m. when he was actually working in the unit.

On June 20, 2000, Taylor proposed a letter of warning for plaintiff because on June 19, 2000, he had been out of the building while on the clock and had not followed instructions. James Sacks, acting MDO, concurred with the proposed discipline. Plaintiff does not allege that Sacks discriminated or

---

[2]    Plaintiff testified that he never received an official discussion for this incident.

retaliated against him, but on June 21, 2000, plaintiff filed an EEO complaint, apparently as to the letter of

warning which Taylor proposed for the incident on June 19, 2000.[3]

On July 18, 2000, Taylor gave plaintiff a letter of warning for failure to follow instructions and

unauthorized absence.  The letter notes that (1) on June 17, 2000, plaintiff went to lunch from 10:00 p.m.

until 10:40 p.m., but the time clock shows that he went to lunch at approximately 10:55 p.m., when he was

actually working in his unit; (2) on June 18, 2000, plaintiff was gone from his unit from 7:00 p.m. until

7:35 p.m. for lunch, when a supervisor saw him at a convenience store, but the time clock showed that he

actually went to lunch at approximately 7:35 p.m.; (3) on June 19, 2000, plaintiff went on break from the

FSM unit at 10:00 p.m. and was to report to the Manual unit at 10:30 p.m., but did not report until

11:00 p.m.; the time clock showed that plaintiff had timed out for lunch at 10:40 p.m. (when he was actually

working) and that he did not time back in from lunch.  The letter stated that plaintiff had violated USPS

policy and that future deficiencies would result in more severe disciplinary action which could include

suspensions or termination.[4]

On August 5, 2000, Ron Crump, a USPS supervisor, proposed a seven-day suspension for

plaintiff for failure to follow instructions.  Specifically, Crump reported that on August 4, 2000, at

approximately 10:25 p.m, he told plaintiff to stay for two hours of overtime beginning at 11:30 p.m., but

that plaintiff stated that he would not do so.  Instead, plaintiff clocked out early at 11:26 p.m.  Plaintiff

testified that this incident never occurred, but he did not file a grievance with respect to the disciplinary

---

[3]      The Court cannot ascertain the specific allegations of plaintiff's EEO complaint because
he did not submit a copy.  See Exhibit 10 to Doc. #105 (attachment missing).

[4]      The letter of warning indicates that plaintiff refused to sign it, but plaintiff testified that he
never saw the letter until 2004.

action proposal.

On August 22, 2000, USPS issued plaintiff a notice of seven-day suspension based on the incident on August 4, 2000. Plaintiff filed a grievance as to the suspension, but Michael Tamayo, the SDO, dismissed it. Tamayo found that Crump had instructed plaintiff to work overtime but plaintiff refused to do so. Plaintiff does not allege that Crump discriminated against him because of race or retaliated against him for the exercise of his EEO rights.

On September 10, 2000, Danny Randel, a USPS supervisor, gave plaintiff permission to go to his vehicle in the parking lot. While in the parking lot, plaintiff saw Taylor. Taylor reported to USPS management that plaintiff was standing out front on the walkway and told her to "quit fucking with [him]." She reported that he then said "quit fucking with me, you will know how or you will learn." When Taylor reported the incident, she knew that plaintiff had filed an EEO complaint against her.

Based on Taylor's report of the threat by plaintiff, USPS sent plaintiff home from work. USPS investigated Taylor's allegations and determined that plaintiff had violated USPS policy against violence.[5] Sacks proposed plaintiff's removal and Mark Scarborough, plant manager, approved the disciplinary action. Plaintiff does not allege that Sacks or Scarborough discriminated or retaliated against him.

On September 20, 2000, based on the threat incident involving Taylor, the letter of warning on

_____

[5]       USPS has a zero tolerance policy against violence in the workplace. USPS defines violence as "[a]ny verbal, physical, or psychological threat or assault on an individual that has the intention or results in physical and/or psychological damage." The policy states that USPS will not tolerate "harassment, intimidation, threats, or bullying." During Clark's tenure as acting plant manager, no USPS employee other than plaintiff was alleged to have violated the zero tolerance policy against violence. Plaintiff did not know of anyone else whom USPS had charged with violating the policy as to a USPS supervisor, but Taylor grabbed plaintiff once on the work room floor in 2000.

July 18, 2000 and the seven-day suspension on August 22, 2000, USPS issued a notice of removal terminating plaintiff's employment effective October 26, 2000.

Shortly thereafter, plaintiff filed a grievance under the CBA and an EEO complaint which alleged that the USPS had terminated his employment because of his race and in retaliation for his prior EEO complaints. The grievance appeal form filed by plaintiff's union admits that plaintiff told Taylor to "Quit fucking with me" but denies that his statement constituted a threat of violence.[6]

On November 3, 2000, plaintiff's union filed a grievance appeal. In that appeal, the union admitted that plaintiff initially denied that he had been outside on September 10, 2000, when Taylor was leaving the building, but claimed that plaintiff was not thinking clearly when Frank Serratore (the MDO) and James Sacks (the SDO) questioned him.[7]

On January 23, 2001, USPS, the Postal Worker's Union and plaintiff entered an agreement which reduced the notice of removal to a long-term suspension without back pay and allowed plaintiff to return to work on January 29, 2001. The agreement provided that plaintiff would withdraw any complaints involving the matter. Plaintiff also acknowledged his responsibility and agreed to abide by the zero tolerance policy, as well as all other USPS rules and regulations.

In February of 2001, USPS assigned Taylor as the MDO on Tour III.[8] Plaintiff was not pleased

---

[6]     In his deposition, plaintiff denied saying anything to Taylor in the parking lot. In his deposition, plaintiff also denied that he had ever used the word "fuck" in the workplace. Taylor testified that other than the incident on September 10, 2000, she had not heard plaintiff curse at work.

[7]     In his deposition, plaintiff testified that he did not recall telling anyone that he had not been in the parking lot on the evening of September 10, 2000.

[8]     In 2000 and 2001, the P&DC operated 24 hours a day, seven days a week, with three
(continued...)

that he was also assigned to Tour III and asked Clark to re-assign him to Tour II.  Clark did not have any

openings on Tour II, but he indicated that plaintiff could switch to Tour I.  Plaintiff, however, did not want

to switch to Tour I.

Shingleton began working as a supervisor in training during plaintiff's long-term suspension for

threatening Taylor.  Taylor was Shingleton's mentor.  Taylor and Shingleton talked every day about both

work and personal matters.  In March of 2001, Shingleton became one of plaintiff's direct supervisors.

USPS sometimes requires employees to learn a "scheme," i.e. a pattern to sort mail for carriers

who deliver the mail.  In February of 2001, Robert Buck, who did not know plaintiff's race or that plaintiff

had ever exercised EEO rights, assigned plaintiff to scheme training.  If a PTF employee like plaintiff passed

scheme training, he or she could become a FTR employee with certain seniority rights and other benefits.

From approximately January of 1999 to November of 2002, Buck was responsible for assigning

jobs to PTF employees in the Mid-America District.  Buck, who did not know plaintiff's race or prior EEO

activity, assigned plaintiff to scheme training because he determined that plaintiff was the most senior PTF

available for the open position.  No one told Buck to select plaintiff for scheme training.  Buck chose the

most senior PTF then available for placement, i.e. the individual who was most senior who was not already

in training.[9]  On February 8, 2001, Buck sent plaintiff a standard job assignment letter regarding scheme

training.  The letter identified the scheme position and notified plaintiff that as a PTF employee, if he failed

---

[8](...continued)

employee shifts.  Tour I typically operated from 10:30 p.m. to 7:00 a.m.  Tour II typically operated from 7:00 a.m. to 3:30 p.m.  Tour III typically operated from 3:00 p.m. to 11:30 p.m.

[9]      Plaintiff maintains that he was not the most senior PTF employee, but at the EEO hearing on January 27, 2004, plaintiff testified that he was "the most senior PTF as far as clerks" in his unit.

an assigned scheme, he could be disqualified from the job, reassigned (if a position was available) or terminated, as circumstances warranted. Buck included that same language on all letters issued to PTF employees about scheme training.

On May 1, 2001, plaintiff filed a formal EEO complaint alleging that defendant had discriminated and retaliated against him by assigning him to scheme training. Plaintiff's complaint noted additional examples of race discrimination and retaliation including cutting his work hours and utilizing casual employees, Taylor's constant reassignment of plaintiff, Taylor's monitoring and micro-managing plaintiff's work, and an incident in which Taylor physically attacked plaintiff.

On June 1, 2001, plaintiff filed a formal EEO complaint, alleging that defendant discriminated and retaliated against him when Taylor changed his work schedule, denied him sick leave and placed him on a last chance agreement concerning his sick leave.

On July 11, 2001, the USPS consolidated plaintiff's formal EEO complaints of May 1 and June 1, 2001 and identified both claims as Agency No. 1-I-661-0012-01. The USPS identified the scope of the investigation on those claims as follows: (1) plaintiff's assignment to scheme training on February 8, 2001 and (2) harassment and hostile work environment by Taylor since plaintiff returned to work in January of 2001, consisting of schedule changes, denial of sick leave, and being placed on a last chance agreement concerning his sick leave. The USPS gave plaintiff an opportunity to contest the scope of the investigation, but he did not do so.

Near the time that Shingleton became plaintiff's direct supervisor, she told Taylor that she was going to take plaintiff off her hands. Shingleton testified that plaintiff did not have a very strong work ethic, that he was a below average employee, that he frequently was not at his assigned work station, that he

cursed and yelled at her and that he refused to work overtime on some 12 occasions.[10]  Shingleton, however, never issued any formal discipline to plaintiff.

Some time in August of 2001, MDO Steven Miller told Shingleton that he would not give her a detail, i.e. a specific job assignment, until she could get control of her unit.  On August 22, 2001, Shingleton, who knew that plaintiff had filed an EEO complaint against her, saw plaintiff at the Great Plains Mall in Olathe, Kansas at about 2:00 p.m.  In a written statement, Shingleton alleged that plaintiff approached her and said "I have dreamed about what I would do to you if I ever saw you alone, outside of work . . . .  If I wasn't here [with] my daughter and my family I'd, oooh, I'd tear you up."  Shingleton's written statement indicated that a food court employee witnessed the incident and gave Shingleton her name and number.  Shingleton ran to her car and notified Taylor.  Shingleton told Taylor that she was going to file a police report.

Later that day, immediately upon his arrival to work at approximately 6:00 p.m., Taylor interviewed plaintiff alone regarding the alleged threat at the mall.[11]  Plaintiff asked for union representation, but a union steward did not attend the meeting.  Plaintiff gave Taylor a written statement, denying that he threatened

---

[10]    Plaintiff contends that Shingleton instructed him to work overtime less than one hour before his scheduled clock out time, which violated the one-hour notice requirement in the CBA.  In addition, plaintiff asked his immediate supervisor if he was to stay, but his supervisor told him to clock out and leave.

[11]    At about the same time that evening, Shingleton filed a report with the Olathe Police Department.  The police report indicated that the officer later called and confirmed with the food court employee that plaintiff told Shingleton something to the effect that "I have dreamed about what I would do to you if I ever saw you alone outside of work."  Shingleton requested a copy of the police report, but an officer gave her only a copy of the first page of the multi-page report.  The first page of the police report included Shingleton's contact information, but did not include any substantive information about her allegations or the name of the alleged perpetrator.  The record does not reflect that the USPS received any part of the police report in 2001.

10

Shingleton at the mall.  Taylor later testified that plaintiff refused to provide a written statement.  Taylor, who knew that plaintiff had filed EEO complaints against her in September of 2000 and May of 2001, decided to place plaintiff on emergency leave.

After Amarello learned that plaintiff had arrived for his shift, Amarello met with plaintiff, Taylor and a union steward.[12]  Plaintiff said that he was at the mall but that he did not threaten Shingleton and in fact, Shingleton had threatened him at some time.  Taylor and Amarello told plaintiff that he would be placed on emergency leave.  Amarello then escorted plaintiff from the building.  In a written statement, Amarello reported that when he escorted plaintiff out of the building, plaintiff threatened him by stating "You a bad mother fucker hiding behind that badge and desk.  You're a punk ass mother fucker like I said before. I'll be back and I'll take care of your punk ass then.  Then what you gonna do?  You ain't shit."  Amarello reported that he just smiled and walked plaintiff to the parking lot.  Plaintiff testified that he did not say anything to Amarello as he was being walked out.[13]  Amarello testified that he regarded plaintiff's statements on August 22, 2001 to be a threat against him.

Taylor asked Shingleton to draft a written statement detailing her allegations against plaintiff. Shingleton did so, but Taylor put the statement in a large envelope and stuck it in her desk drawer.  By the next day, August 23, 2001, Clark removed Taylor from the investigation because of her history with plaintiff.  Amarello took over the investigation, but until his deposition in 2006, he never saw the written

---

[12]     Amarello thought that he was the first person at USPS to whom Shingleton reported the alleged threat at the mall.  Shingleton, however, had already reported the threat to Taylor.  Amarello stated that after he informed plaintiff that he was placing him off the clock pending an investigation, plaintiff cussed him out with the union steward present.

[13]     During his deposition, plaintiff initially denied saying anything, but later clarified that he said to himself "I can't believe this is happening again" as Amarello escorted him from the building.

statements of Shingleton or plaintiff.

On August 23, 2001, plaintiff sought EEO counseling, alleging race discrimination and harassment related to his placement on emergency leave the previous day. The USPS accepted the new claim to be included in the ongoing investigation of plaintiff's complaints.

On September 12, 2001, Shingleton prepared a statement about several confrontations with plaintiff. First, approximately six months earlier, she had asked plaintiff to work overtime, but he refused and yelled and cussed at her. Next, Shingleton reported that plaintiff wasted a lot of time. Finally, Shingleton reported that on one occasion, plaintiff was absent for 20 minutes without informing her and then told her to "shut up" and get away from him.

In September of 2001, in response to plaintiff's EEO complaint, Shingleton produced two documents which she allegedly printed and signed on July 14, 2001. One document reflects Shingleton's narrative of an incident in which plaintiff was absent from his assigned station for approximately one hour. The other document reflects Shingleton's narrative of an incident in which she found plaintiff in the parking lot when he was on the clock. Shingleton did not discipline plaintiff for these incidents, but she testified that in July of 2001 she decided that she needed to document some things before she could discipline plaintiff. Shingleton put the documents in her personal file cabinet and did not share them with anyone until September of 2001. Plaintiff denies that these incidents ever occurred.

On September 12, 2001, Amarello met plaintiff, Taylor and a union steward to discuss Shingleton's claim about the incident at the mall. Before the meeting, Amarello did not investigate the matter except to

ask Shingleton whether the food court employee would be willing to make a statement.[14]  Amarello should

have talked to Shingleton about plaintiff's alleged threat against her, but he did not do so.  At the meeting

with Amarello, plaintiff apologized for any misunderstanding, said he did not threaten Taylor and asked

when he could return to work.  Based upon Shingleton's allegations and plaintiff's comments at the meeting,

Amarello recommended that the USPS terminate plaintiff's employment.

Plaintiff admits that he saw Shingleton at the mall, but maintains that Shingleton and Taylor made

up the story that he threatened Shingleton.  Ayanna Kerr testified that she was with plaintiff and their two

children the entire time at the mall.  Kerr testified that at the mall, plaintiff identified Shingleton as a person

with whom he had job problems, but that he never talked to Shingleton at the mall.

MDO Steven Miller told Madison that Belinda Price, a USPS employee, had heard Shingleton and

Taylor tell each other something to the effect that they really got one over on plaintiff.  Madison called

Vogel and informed him of Miller's report.  Vogel discussed the conversation with his supervisor, Diane

Whitworth.  Vogel later informed Madison that after investigation, he determined that the alleged

conversation was hearsay and that Price did not make the alleged statement to Miller.  Price testified that

no one talked to her about the alleged conversation and that she does not recall hearing such a

conversation.

---

[14]     At some point, Amarello asked Shingleton whether the food court employee would be
willing to make a statement and Shingleton said that the employee did not want to get involved.  Amarello
did not make any further attempt to contact the food court employee.  Shingleton told Madison that the
food court employee told Shingleton that she did not hear what plaintiff said to Shingleton at the mall.
        Randy Vogel, the labor relations specialist who was assigned to assist USPS management in
disciplinary and labor matters and ensure compliance with federal employment laws, informed Madison that
a witness at the mall would corroborate Shingleton's story.  Vogel believes that he attempted to contact
the food court employee, but that he was unsuccessful.

On September 21, 2001, Amarello sent plaintiff a letter which stated that he recommended that plaintiff's employment be terminated because of his threat to Shingleton, his previous long-term suspension for the threat to Taylor, the letter of warning dated July 18, 2000, the seven-day suspension on August 22, 2000 and his threatening statements to Amarello on August 22, 2001 as Amarello escorted him from the building.  Clark approved the termination for the reasons stated in Amarello's letter.  Clark thought that Shingleton and Taylor were more valuable to USPS than plaintiff, a PTF, who was regarded as a below average worker and who had threatened three supervisors.

Taylor segregated the machines in her work group by assigning all minority employees to the same machine.  Taylor more closely monitored the machine to which she assigned minority employees.  Taylor frequently changed the rules related to breaks and other workplace procedures to benefit non-minority employees.  When employees failed to follow her unilateral and unannounced rule changes, Taylor generally disciplined only the minority employees.  For example, Taylor would not allow minority employees to talk to one another while working or to take breaks together, but she allowed non-minority employees to do so.  Taylor also allowed non-minority employees to take breaks that were longer than allowed by USPS rules, but disciplined minority employees if they were late returning from break.

Employees filed numerous EEO race discrimination complaints against Taylor.  Members of management often teased Taylor about the number of EEO complaints against her, asking her such things as "get any EEOs filed against you today?"

Defendant's policy required managers and supervisors to treat complaints of discrimination seriously and to conduct an investigation (regardless whether the complaint was reported by the victim or a third party).  Amarello estimated that on three or four occasions, he heard complaints of race

14

discrimination about Taylor.  On each occasion, Amarello talked to Taylor about the allegations.  Based on information which Taylor provided Amarello, Amarello concluded that no further investigation was necessary.

After plaintiff left the USPS and after several more complaints of race discrimination, management performed a climate survey of Taylor's work group.  Many employees had complaints similar to plaintiff's.  At the end of the climate survey, the manager told Taylor that three black female employees were like children and determined that no discrimination had occurred.

On one occasion, in September of 2000, Taylor grabbed plaintiff's arm as he tried to walk away.  USPS management received two witness statements about the incident, but Taylor was not suspended and management did not investigate the incident under the zero tolerance policy against violence.  At the time, plaintiff thought that Taylor's conduct was sexual harassment.  Plaintiff did not believe that Taylor grabbed his arm because of his race or in retaliation for EEO activity.  Plaintiff's initial union grievance described the incident as Taylor putting her hand on plaintiff's shoulder.  Scarborough dismissed plaintiff's grievance about Taylor grabbing plaintiff because it was contrary to plaintiff's prior claim and plaintiff never made such a claim during the investigation interview.  The USPS did not discipline Taylor for the incident.

In 2001, Taylor asked plaintiff for documentation on his brother's death in order to approve emergency leave.  Taylor's letter indicated that plaintiff needed to supply the requested documentation pursuant to plaintiff's Last Chance Agreement.  Plaintiff, however, was not under a Last Chance Agreement at any time during his employment with the USPS.

Taylor often paged plaintiff over the intercom, even when he was in his assigned work group.  Shingleton cut the working hours of plaintiff and Maria Galvan while, at the same time, she asked non-

minority casual employees to complete their work.

On September 28, 2001, plaintiff sought EEO counseling, alleging discrimination and harassment related to his notice of removal on September 21, 2001.  The USPS found that claim to be related to the issues in plaintiff's ongoing complaint and accepted that claim to be included in the ongoing investigation. On March 29, 2004, the EEOC found against plaintiff and in favor of USPS on all of his claims of discrimination, harassment and retaliation.

On September 3, 2004, plaintiff filed suit against the Postmaster General of the USPS.  Plaintiff alleges that the USPS discriminated against him because of race and retaliated against him for protected activity, in violation of Title VII.

**Analysis**

**I.      Failure To Exhaust Administrative Remedies**

Defendant argues that plaintiff's claims are limited to those which he exhausted administratively. These claims include (1) that because of his race and in retaliation for his EEO activity, defendant assigned plaintiff to scheme training in February of 2001; (2) that defendant maintained a racially hostile work environment between January 29 and September 21, 2001; and (3) that because of his race and in retaliation for his EEO activity, defendant terminated plaintiff's employment on September 21, 2001.  In his response, plaintiff concedes that these are the only claims which he is pursuing.[15]

---

[15]      Because the pretrial order sets forth plaintiff's legal theories generally, the pretrial order is amended to reflect that plaintiff's claims are limited to those set forth above.  Defendant's motion to dismiss other claims is overruled as moot.

## II.     Assignment To Scheme Training

Defendant argues that he is entitled to summary judgment on plaintiff's discrimination and retaliation claims based on plaintiff's assignment to scheme training because (1) Buck did not know plaintiff's race or prior EEO activity when he assigned plaintiff; and (2) the assignment was not an adverse employment action.  Plaintiff has not responded to either argument.  Accordingly, the Court sustains defendant's motion for summary judgment on these claims as uncontested and for substantially the reasons set forth in defendant's memorandum in support of its motion for summary judgment.

## III.     Termination Of Employment

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Court applies a disparate treatment analysis to claims alleging that an employer treats some people less favorably than others because of their race, color, religion, sex or national origin.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  To prevail on his disparate treatment claim under Title VII, plaintiff must show that the alleged discrimination was intentional.

Because he relies upon indirect evidence, plaintiff's claim of racial discrimination is subject to the familiar three-step McDonnell Douglas analytical framework.  See Kendrick v. Penske Transp., Servs., Inc., 220 F.3d 1220, 1225-1226 (10th Cir. 2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Under McDonnell Douglas, plaintiff has the initial burden of showing a prima facie case of racial discrimination in his employment termination.  Kendrick, 220 F.3d at 1226.  Plaintiff satisfies this burden by presenting a scenario which on its face suggests that defendant more likely than not discriminated

against him.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  As to each claim of disparate treatment, plaintiff may make a prima facie case by showing that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)).  The burden of establishing a prima facie case of disparate treatment is not onerous.  For purposes of summary judgment, defendant concedes that plaintiff has established a prima facie case.  The burden thus shifts to defendant to articulate a legitimate, nondiscriminatory reason for the questioned action.  See Nulf v. Int'l Paper Co., 656 F.2d 553, 558 (10th Cir. 1981).

Defendant asserts that the USPS terminated plaintiff's employment because (1) plaintiff threatened Shingleton; (2) plaintiff had a history of misconduct; (3) the USPS found no evidence of a conspiracy against plaintiff; and (4) the USPS decided to protect its more valuable employees.  Defendant has met its burden to articulate a facially nondiscriminatory reason for terminating plaintiff's employment.  See Kendrick, 220 F.3d at 1229-1230.

Under the third step of the McDonnell Douglas framework, the burden shifts back to plaintiff to show that defendant's stated reasons for his termination are merely a pretext to hide racial discrimination.  Id. at 1230; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).  Defendant asserts that he is entitled to summary judgment because plaintiff has produced no evidence from which a jury could conclude that the real reason for terminating his employment was race.  The relevant issue is not whether the stated reasons for termination were wise, fair or correct but whether defendant honestly believed in those reasons and acted in good faith.  Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004).  In examining this

18

issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."

Kendrick, 220 F.3d at 1231.  The Court's role is not to second guess an employer's business judgment.

Stover, 382 F.3d at 1076.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.

Kendrick, 220 F.3d at 1230.  More specifically, evidence of pretext may include, but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528 U.S. 815 (1999).

Plaintiff asserts that he has shown pretext because defendant assumed without investigation that Shingleton's allegations against plaintiff were true.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that (1) Taylor discussed Shingleton's allegations with plaintiff without a union steward present; (2) Taylor took written statements from plaintiff and Shingleton, but did not share

these statements with anyone (including Amarello, who took over the investigation the next day); (3) despite the fact that plaintiff told Amarello that he did not threaten Shingleton, Amarello did not further investigate the matter except to ask Shingleton whether the food court employee would be willing to make a statement; (4) plaintiff had a companion at the mall who testified that plaintiff never talked to Shingleton; and (5) on several occasions, Amarello had investigated allegations of race discrimination against Taylor by simply talking to her and not doing any further follow up with the victim or witnesses.  In these circumstances, a reasonable jury could find that defendant conducted a sham investigation and that the stated reasons for termination were false.  Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's claim that defendant terminated him because of race.[16]

## IV.     Hostile Work Environment Racial Harassment

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff may establish a violation of Title VII by proving that discrimination based on race created a "hostile or abusive work environment."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that (1) he is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to create an abusive

---

[16]     The same evidence of pretext, combined with the temporal proximity of plaintiff's termination and prior EEO complaints, is sufficient for a reasonable jury to find in favor of plaintiff on his claim that in retaliation for his EEO activity, defendant terminated his employment on September 21, 2001. The Court therefore overrules defendant's motion for summary judgment on that claim as well.

working environment; and (5) some basis exists for imputing liability to the employer.  See Brandau v. State of Kan., 968 F. Supp. 1416, 1420 (D. Kan. 1997).

To prevail under a hostile work environment theory, plaintiff must show that racially-oriented conduct had the purpose or effect of unreasonably interfering with his work performance or created an intimidating, hostile or offensive working environment.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  The existence of such an environment can only be determined by looking at the totality of the circumstances present in the work place, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.; see Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  The Court evaluates these factors from both a subjective and an objective viewpoint.  Harris, 510 U.S. at 21.  The Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position.  See Davis v. United States Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).

Defendant asserts that he is entitled to summary judgment because plaintiff has not shown that the harassment was sufficiently severe or pervasive to create an abusive working environment.  Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]laintiff's employment."  See Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997).  The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact.  O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999).  Isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct.  Northwest

21

<u>Fin.</u>, 129 F.3d at 1414.

Plaintiff's evidence of a hostile work environment is that

1.    Taylor segregated the machine assignments in her work group by assigning all
      minority employees to the same machine.  Taylor more closely monitored the
      machine to which she assigned minority employees.

2.    Taylor frequently changed the rules related to breaks and other workplace
      procedures to benefit non-minority employees.  For failing to follow unilateral and
      unannounced rule changes, Taylor generally issued discipline only to minority
      employees.

3.    Taylor would not allow minority employees to talk to one another while working
      or to take breaks together, but she allowed non-minority employees to do so.
      Taylor also allowed non-minority employees to take breaks that were longer than
      allowed by USPS rules, but she disciplined minority employees if they were late
      returning from break.

4.    Taylor physically contacted plaintiff on the work room floor.

5.    Taylor asked plaintiff for documentation on his brother's death in order to approve
      emergency leave.  Taylor's letter indicated that plaintiff needed to supply the
      requested documentation pursuant to plaintiff's Last Chance Agreement.  Plaintiff,
      however, was not under a Last Chance Agreement at any time during his
      employment with the USPS.[17]

6.    Taylor often paged plaintiff over the intercom, even when he was in his assigned
      work group.

7.    Taylor cut plaintiff's work hours, and utilized casual employees in his place, in
      violation of the CBA.

8.    In September of 2000, Taylor falsely accused plaintiff of threatening her.

9.    Despite the fact that plaintiff had a pending EEO complaint against Taylor, she
      conducted the initial investigation of Shingleton's complaint and authorized

_____

[17]    In early 2001, the USPS proposed to place plaintiff on a Last Chance Agreement, but it
apparently agreed not to do so after plaintiff filed an EEO complaint on the issue.

22

plaintiff's emergency removal with regard to the incident.

Plaintiff's Reply In Opposition To Defendant's Motion For Summary Judgment (Doc. #105) filed March 27, 2006 at 48-50.[18]

Initially, the Court notes that plaintiff has set forth no specific allegations as to Shingleton – who was his direct supervisor during nearly all of the relevant time frame (from January 29 through September 21, 2001). Plaintiff never heard a USPS supervisor use racial epithets or tell racially derogatory jokes. The first three facts outlined above relate to Taylor's treatment of minorities generally and does not show that Taylor took such actions against plaintiff during the relevant time period.[19] Although the next five facts involve Taylor's treatment of plaintiff, plaintiff has not presented evidence that any of these incidents

_____

[18]     Plaintiff also claims that (1) Taylor did not follow the required procedure under the CBA regarding assignment of jobs to minority PTF employees; (2) Taylor assigned non-minority employees with less seniority to work the more desirable jobs; (3) even when she was not the direct supervisor for PTF employees, Taylor made it a point to relentlessly micro-manage and direct minority PTF employees; and (4) Buck assigned plaintiff to scheme training in violation of the CBA because he was not the most senior available PTF employee. Plaintiff has not explained how his first conclusory allegation pertains to him or any specific assignments during the relevant time period. Plaintiff's remaining three allegations are not supported by record evidence which plaintiff has cited. See Plaintiff's Reply (Doc. #105) at 25.

[19]     Taylor's general treatment of minorities is relevant to the existence of a hostile work environment, see Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995), but the impact of "second-hand harassment" is obviously not as great as the impact of harassment directed at plaintiff. Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997). Absent evidence that the purported harassment affected plaintiff's general work atmosphere during the relevant time period, and absent evidence regarding the frequency or specific nature of the alleged discriminatory conduct, a reasonable jury could not conclude that the conduct was sufficiently severe or pervasive to affect plaintiff's working conditions. Howard v. Bd. of Educ. of Memphis City Schs., 70 Fed. Appx. 272, 285-86 (6th Cir. July 1, 2003); see also Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263, 1271 (10th Cir. 2004) (employee's distress at close monitoring not sufficient proof that workplace was objectively intolerable); Bell v. Georgia-Pacific Corp., 390 F. Supp.2d 1182, 1191-92 (M.D. Fla. 2005) (assertion that supervisors often stood behind plaintiff looking over his shoulder while he worked insufficient to show severe or pervasive harassment).

took place during the relevant time period.  The last fact does involve an adverse action against plaintiff during the relevant time period which may be the basis for plaintiff's disparate treatment claims, but it is insufficient by itself to support an independent claim for a hostile work environment.  Taken as a whole, even if Taylor took the alleged actions during the relevant time period, no reasonable jury could find that the conduct was sufficiently pervasive to create an objectively hostile work environment.  Accordingly, the Court sustains defendant's motion on this ground.

IT IS THEREFORE ORDERED that Defendant's Motion To Dismiss, Or In The Alternative For Summary Judgment (Doc. #98) filed March 3, 2006 be and hereby is **SUSTAINED in part**.  The Court sustains defendant's motion as to (1) plaintiff's claim that because of his race and in retaliation for his EEO activity, defendant assigned plaintiff to scheme training in February of 2001 and (2) plaintiff's claim that defendant maintained a racially hostile work environment between January 29 and September 21, 2001.  Defendant's motion is otherwise overruled.

Dated this 17th day of July, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

24